FILED

2005 Aug-12  AM 09:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **TYRON AND DELENE WHITE, et. al.,** | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| **v.** | } | **Case No.: 5:02-CV-1712-RDP** |
| | } | |
| **RICKY NICHOLS and DEXTER RUTHERFORD,** | } | |
| | } | |
| **Defendants.** | } | |

**MEMORANDUM OPINION**

The court has before it Defendants' Motion for Summary Judgment (Doc. # 49) and Defendants' Motion to Strike (Doc. # 63).  The above-referenced motions have been fully briefed and were under submission as of January 25, 2005.  (Docs. # 47, 55).

The only remaining Plaintiffs in this case are Doyle Grimes, who brought suit on behalf of Cody Grimes ("Cody"), a minor and a student at Lawrence County High School ("LCHS"), and Blake Grimes ("Blake"), who was a minor at the time this case was filed but is now the age of majority and a graduate of LCHS. (B. Grimes Depo. p. 8).[1]  Plaintiffs have sued Defendant Ricky Nichols, the principal of LCHS, and Defendant Dexter Rutherford, superintendent of the Lawrence County, Alabama School System, under 42 U.S.C. § 1983 and claim those Defendants have violated their rights in the following ways:  they have (1) deprived Plaintiffs of their rights under the First Amendment to the Constitution of the United States; (2) discriminated against Plaintiffs on the basis of national origin in violation of their rights to equal protection under the Fourteenth Amendment;

---

[1] All other Plaintiffs have voluntarily dismissed their claims.  (Docs. # 68, 69).  At the time of the incident made the basis of this lawsuit Blake was an eleventh grade student at LCHS (B. Grimes Depo. pp. 38-39), and Cody was an eighth grade student at LCHS. (C. Grimes Depo. pp. 10, 108).

(3) discriminated against Plaintiffs on the basis of race in violation of their rights to Equal Protection under the Fourteenth Amendment; and (4) deprived Plaintiffs of their rights to due process under the Fourteenth Amendment. (Doc. # 16).   In addition to presenting certain arguments on the merits in response to Plaintiffs' claims, Defendants have asserted that Plaintiff Blake Grimes lacks standing to pursue his claims and that both Defendants are due the protection of qualified immunity.

For the reasons outlined below, Defendants' Motion for Summary Judgment is due to be granted because there are no disputed issues of material fact and Defendants have demonstrated that they are entitled to judgment as a matter of law. Defendants' Motion to Strike will be denied.[2]

## I.    Legal Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *See id.* at 323.   Once the moving party has met his burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific

---

[2] The court has reviewed Defendants' motion to strike and will assume, without deciding, for the purposes of summary judgment only, that it is due to be denied and that the evidence sought to be stricken is properly considered by the court in its summary judgment analysis.   As the court is granting summary judgment in favor of Defendants, it finds that, even considering the evidence sought to be stricken, when the proper summary judgment standard is applied, Plaintiffs have not met their burden to refute the Defendants' motion for summary judgment.

facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* 249.

## II. Relevant Undisputed Facts[3]

On Friday, October 12, 2001, Principal Nichols announced over the school intercom system at LCHS that, as of the following Monday, students would no longer be permitted to wear clothing displaying the Confederate flag. (Nichols Depo. p. 101-103).[4] Nichols had contacted Superintendent Rutherford before announcing the ban and informed him of his intention. (Nichols Depo. p. 87).[5] The ban applied only to LCHS; students at the Lawrence County School's Vo-Tech facility were permitted to wear Confederate symbols. (B. Grimes Depo. p. 55). Eighty-six (86) students signed

---

[3] If facts are in dispute, they are stated in the manner most favorable to the Plaintiffs. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

[4] Although Plaintiffs initially thought that the ban included all Confederate symbols (B. Grimes Depo., p. 105; D. Grimes Depo., p. 69), Rutherford and Nichols have clarified that the ban covered just Confederate clothing. (Rutherford Depo., p. 118; Nichols Depo., p. 103). In fact, class rings with Confederate flag symbols were available for purchase at LCHS (through sales by third parties) and it is undisputed that the ban does not extend to jewelry/class rings or other non-clothing items. (Rutherford Depo., p 118; D. Grimes Depo., p. 39, 69; Nichols Depo., p 135).

[5] Nichols' decision was subject to review by Superintendent Rutherford. (Nichols Depo. p. 35-36).

a petition protesting the ban on Confederate symbols. (Doc. # 59, Ex. 7 C; 8 c, at p.1).

On the following Monday, a number of students wore Confederate flag shirts in violation of the rule.   (Nichols Depo. p. 104-106).  Principal Nichols asked each student wearing Confederate flag clothing if he or she was aware of the ban, and those who were not aware were permitted to change clothes or cover their Confederate flag shirts for the remainder of the day. (Nichols Depo. p. 104-106). Those who admitted that they were aware of the rule were suspended from school. (Nichols Depo. p. 104-106).

Plaintiff Blake Grimes was one of the students who admittedly was aware of the ban but nonetheless planned with other students to deliberately defy it. (B. Grimes Depo. p. 48-49, 50-51, 140).[6] On Monday, October 15, Principal Nichols called Blake to his office to meet about the Dixie Outfitters Confederate flag shirt he had worn that day, and Blake was allowed to explain his reasons for wearing the shirt in violation of the ban. (B. Grimes Depo. p. 81, 92-93).[7]  Blake admitted that he was aware of the rule, and he was suspended from school for three days.  (B. Grimes Depo., p 83-84; Nichols Depo. 104).

Blake and his parents also met with Superintendent Rutherford about the ban on Confederate clothing and Blake's suspension. (B. Grimes Depo. p. 94-95; D. Grimes Depo. pp. 24-25). As a result of the meeting with Rutherford, Blake's suspension from school was removed from, or never entered on, his permanent record. (B. Grimes Depo. p. 95-96). Also, as a result of the meeting Blake

---

[6] Blake told his parents on Sunday night that he intended to wear a Confederate flag shirt on Monday to protest the ban, and although his mother advised him against it, she did not forbid it. (B. Grimes Depo. p. 66).

[7] Blake's mother was a substitute teacher at LCHS, and when he Principal Nichols called him to his office, his mother went with him. (B. Grimes Depo. p. 81).

was allowed to make up any missed school work during the suspension, including a math test that he missed. (B. Grimes Depo. p. 97). Blake and his parents also attended the next regularly scheduled board meeting. (B. Grimes Depo. pp. 101-102).[8]

Cody Grimes also learned about the ban when Principal Nichols announced it over the intercom system at LCHS on October 12. (C. Grimes Depo. p. 29).  Although Cody wore a Confederate flag shirt to school the following Monday, he removed it when he learned that other students were being suspended for violating the ban. (C. Grimes Depo. p. 46).  Therefore, Cody was not suspended from school. (C. Grimes Depo. p. 36). Cody testified that he had not planned with other students to protest the ban but wore the shirt to defend his Southern heritage. (C. Grimes Depo. p. 48-49).

At the time of the ban, the demographic composition of the student population at LCHS was (approximately) less that 1% Hispanic, 12% African American, 23% Native American and the remainder Caucasian. (Nichols Depo. p. 53-54).  Principal Nichols testified that based upon his observations at LCHS, there was a link between racial tension, interracial incidents, and students wearing the Confederate flag. (Nichols Depo. p. 138-139).  Prior to the ban, an African-American female student and a White male student wearing a tee-shirt depicting a skull wearing a Confederate flag "do-rag" were involved in an incident in which racial slurs were spoken to the minority student. (Nichols Depo. p. 69-71; Doc. # 58,  Ex. 5; Grimes Aff., p. 2 ¶¶ 1, 4).

Nichols also reported that in the Fall of 2001, the mother of an African-American female student at LCHS complained to him that African-American students were concerned about the

_____

[8] Plaintiffs' attorneys also have met with Rutherford and the Lawrence County Board of Education in an attempt to persuade the school to rescind the ban on Confederate flag clothing. (Rutherford Depo. p. 126-129).

display of Confederate symbols at LCHS. (Nichols Depo. pp. 60-61). Between August and October 2001, one or two students reported to Nichols that a group of students, all wearing clothing displaying Confederate flags, had spoken racial slurs in the hallway. (Nichols Depo. p. 65). Nichols also testified that an African-American female student, whose name he cannot recall, reported feeling ill because she was surrounded by Confederate flags and racial slurs spoken by unidentified students. (Nichols Depo. p. 68-69; Doc. # 58, Ex. 4). No students had reported to Principal Nichols that the Confederate flag itself had been used to intimidate them. (Nichols Depo., p. 76). However, all the incidents that involved the Confederate flag and that were reported to Nichols involved students wearing clothing that included the Confederate flag. (Nichols Depo. p. 76).[9]

## III.    Standing and Mootness

As a threshold matter, this court must examine whether it has subject matter jurisdiction over Blake Grimes' claims in his case. *FW/PBS v. Dallas*, 493 U.S. 215, 231 (1990) ("The federal courts

---

[9] Although Plaintiffs' summary judgment opposition asserts that "[the White student] using a racial slur to an African-American female student is the only agreed upon verifiable basis for Nichols banning the flag" (Doc. # 58, at No. 282), Blake Grimes admitted that he and other students understood that the ban was implemented because an African-American student and parent had complained that Confederate flag clothing was offensive to them. (B. Grimes Depo. p. 73). Moreover, although Plaintiffs dispute Nichols' testimony that he received complaints about the Confederate flag and reports of racial incidents from students at LCHS, Plaintiffs do so primarily with affidavits of students who cannot possibly have personal knowledge of each and every complaint Nichols claims to have received. Rather, their testimonies fall into one or more of the following categories: (1) they admit that complaints could have occurred, but did not witness any incidents and/or they believe that any complaints were made by "trouble-makers," (*see e.g.,* Doc. # 58, Ex. 8d, p. 2; C. Grimes Depo. 35-36); (2) they admit that complaints could have occurred, but they believe that the African-American students they know "have no problem with the Confederate flag," (*see, e.g.*, Doc. # 58, Ex. 8d, at p.2); or (3) they doubt that any complaints were made because they believe that if anyone had a problem with the Confederate flag, they "would have heard about it" (*see, e.g.*, Doc. # 58, Ex. 8, at p. 2). This evidence is not sufficient to create a genuine issue of fact regarding Nichols' testimony. Further, and in any event, Plaintiffs admit that, at the very least, one racial incident occurred as a result of Confederate flag clothing.

are under an independent obligation to examine their own jurisdiction."); *Focus on the Family v. Pinellas Suncoast Transit Authority*, 344 F. 3d 1263, 1272 (11th Cir. 2003) (finding that standing and mootness should be addressed at the outset "because [they] directly implicate federal subject matter jurisdiction").   It is undisputed that Blake graduated from Lawrence County High School in 2003 and is no longer a student in the Lawrence County School System.  (B. Grimes Depo., pp. 8-9).

Standing and mootness are two companion components of jurisdiction. "The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n. 22 (1997) (internal quotations omitted).  "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Allen v. Wright*, 468 U.S. 737, 750-51 (1984)(internal quotations omitted).  A case becomes moot when it no longer presents a live controversy with respect to which the court can give meaningful relief. *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1335-36 (11th Cir.2001).

In this case, the court finds that it lacks subject matter jurisdiction over Blake Grimes' claims both because he lacks standing to assert them and because they have become moot.  With respect to standing, the Supreme Court has defined several requirements, all of which must be satisfied:  (1) an injury-in-fact, meaning an injury that is concrete and particularized, and actual or imminent; (2) a causal connection between the injury and the causal conduct; and (3) a likelihood that the injury will be redressed by a favorable decision. *See Bennett v. Spear*, 520 U.S. 154, 167 (1997).[10]  The Eleventh Circuit has noted, "because injunctions regulate future conduct, a party has standing to seek

---

[10] The Supreme Court has also identified specific prudential considerations of standing, but none of those come into play here.  *Allen*, 468 U.S. at 751; *see also Bennett*, 520 U.S. at 162.

injunctive relief only if the party alleges . . . a real and immediate – as opposed to a merely conjectural or hypothetical – threat of *future* injury." *Wooden v. Board of Regents of University System of Georgia*, 247 F. 3d 1262, 1284 (11th Cir. 2001).

It is this requirement, which is specific to injunctive relief, that proves fatal to Blake's claims. Plaintiffs in this case seek only prospective injunctive relief in the form of a permanent injunction and declaratory judgment.  (Doc. # 16, at 18-19).  Because Blake Grimes is no longer a student subject to the Confederate ban that serves as the impetus for the claims in this case, he cannot allege a real and immediate threat of future injury.  Accordingly, Blake Grimes lacks standing to pursue his claims for injunctive relief in this case. *See Malowney v. Federal Collection Deposit Group*, 193 F. 3d 1342, 1348 (11th Cir. 1999) (noting that "[i]njury in the past [] does not support a finding of an Article III case or controversy when the only relief sought is a declaratory judgment").[11]

Moreover, under the doctrine of mootness, Blake Grimes' claims are no longer actionable. "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). When events subsequent to the commencement of a lawsuit create a situation in which the court can no longer give the plaintiff meaningful relief, the case is moot and must be dismissed because any decision on the merits of a moot case would be an impermissible advisory opinion. *See Jews For Jesus, Inc. v. Hillsborough County Aviation Auth.*, 162 F. 3d 627, 629 (11th Cir. 1998); *Hall v. Beals*, 396 U.S.

---

[11] Alternatively, Plaintiff claims that Blake's father, Doyle Grimes, still has standing, because "parents have independent standing to bring constitutional challenges to the conditions in their children's schools." (Doc. # 56, at 8 (*citing Donovan v. Punxsutawney Area Sch. Bd.*, 336 F.3d 211, 217 n. 2 (3d Cir. 2003)).  The court agrees that Doyle Grimes still has standing to challenge Defendants' actions with respect to his other minor son, Cody Grimes, but this has no effect on the now moot claims asserted by Blake Grimes. *See Donovan*, 336 F.3d at 217 n. 2 (*citing Honig v. Doe*, 484 U.S. 305, 320-322 (1988)).

45, 48 (1969). In this case, Blake is no longer subject to the rules and regulations of Lawrence County Schools; therefore, there is no longer any live controversy in the present case to which the court could give meaningful relief.

Relying on a non-binding Third Circuit case involving a challenge to religious speech in a graduation ceremony, Plaintiff claims that "graduation from school does not automatically render a case moot if the student's claims are 'capable of repetition, yet evading review.'" *Donovan v. Punxsutawney Area Sch. Bd.*, 336 F.3d 211, 216-17 (3d Cir. 2003). A quick review of *Donovan*, however, demonstrates that it is not only distinguishable from this case, but also fails to support Plaintiff's contention that his claims for injunctive relief remain valid. In *Donovan*, Plaintiff sought both money damages and injunctive relief. *Donovan*, 336 F.3d at 216-17. The Third Circuit held that upon her graduation, the plaintiff's claim for declaratory and injunctive relief became moot and only her claim for damages continued to present a live controversy upon which the case could proceed. *Donovan*, 336 F.3d at 217-18. As noted earlier, Blake has only sought injunctive relief in this case and therefore under *Donovan*, his claims are no longer "capable of repetition."

Accordingly, because the court finds that Blake Grimes has no standing to pursue his injunctive relief claims in this case, and that his claims are moot, summary judgment will be granted in favor of Defendants as to Blake Grimes' claims.

## IV.    Qualified Immunity

Defendants argue that Rutherford and Nichols are protected by the doctrine of qualified immunity because they did not have final policymaking authority and because the school did not have a policy or custom of banning Confederate symbols. (Doc. # 51, at 4). Plaintiffs respond by arguing that Defendants did have final rule-making authority for the school and that regardless, the

school's flag ban was a custom or practice within the meaning of *Monell v. New York City Dep't of Social Svcs.*, 436 U.S. 658 (1978). Both parties' arguments miss the mark. As outlined below, neither qualified immunity nor the *Monell* analysis is applicable to this case because Defendants have been sued only in their official capacities, and Plaintiffs have not sought money damages.

Under § 1983, suits against municipalities and other local government entities are permitted under *Monell*, although liability is limited to situations in which the "execution of a government's policy or custom ... inflicts the injury." *Monell*, 436 U.S. at 694. It is this *Monell* limitation upon which Defendants base what they call their "qualified immunity" defense. (Doc. # 51, at 4-6). Defendants' argument confuses two separate bodies of law, neither of which are applicable to this case.

First, Defendants inappropriately rely on *Monell*. It is undisputed that Plaintiffs have brought claims against only Rutherford and Nichols in their official capacities – not against a municipality or local governmental entity. Although generally a suit for monetary damages against an officer in his official capacity is "in actuality, [a] suit[] directly against the [entity] that the officer represents," *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir.1991)(quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985), official capacity suits seeking only prospective injunctive relief are not deemed to be suits against the entity, *Ex Parte Young*, 209 U.S. 123, 142-48 (1908). Because Plaintiffs seek only prospective injunctive relief in this case, *Ex Parte Young* dictates that their claims are strictly claims against Rutherford and Hayes. *Monell*, therefore, is inapplicable.

Second, Defendants erroneously call upon the doctrine of qualified immunity, which is not available to Rutherford and Nichols because they have been sued in their official capacities. It is well-settled that qualified immunity does not extend to claims against state actors in their official

capacities. *Heggs v. Grant*, 73 F.3d 317, 319 n.5 (11th Cir. 1996); *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 165-67 (1993); *Lassiter v. Alabama A & M Univ., Bd. of Trustees*, 28 F.3d 1146, 1149 n. 2 (11th Cir.1994).  Because the qualified immunity analysis has no place in this case,[12] the court will not examine further the substance of Defendants' argument, and will now turn to the analysis of Plaintiffs' claims.

## V.    Plaintiffs' First Amendment Claims

Plaintiffs' First Cause of Action alleges that Defendants violated their First Amendment right to freedom of symbolic expression by banning clothing displaying the Confederate flag.[13]  The Eleventh Circuit has already considered the issue of school-imposed Confederate flag bans and determined that such bans are not an unconstitutional restriction of the students' First Amendment rights.  *Scott v. School Board of Alachua County*, 324 F. 3d 1246, 1247 (11th Cir. 2003).  Because this court finds no distinction between this case and *Scott*, summary judgment is appropriate on this

---

[12]Defendants' reliance on *Denno v. School Board of Volusia County, Florida*, 218 F.3d 1267 (11th Cir. 2000) for their "qualified immunity" argument is also misplaced.  In *Denno*, a public high school student who had been disciplined for displaying the Confederate flag at school sued the school board and two school administrators *in their individual capacities* under § 1983.  *Denno*, 218 F.3d at 1268.  The court applied qualified immunity to shield the individual defendants from liability, and also found that the school board was not liable for the actions of the individual defendants under *Monell* because the individual defendants were not final policymakers and because Plaintiff failed to show that the board had a well-settled custom of banning the Confederate flag. *Denno*, 218 F.3d at 1270-75.  As noted above, Plaintiffs in this case have not sued the board – such that *Monell* would apply –  nor have Plaintiffs claimed monetary damages – such that qualified immunity would apply.  Thus, *Denno*'s qualified immunity analysis is also inapplicable.

[13] Plaintiffs' Second Amended Complaint also alleges that Defendants violated Plaintiffs' First Amendment "right to inoffensively express their religious convictions, through the display of a venerated religious icon, Confederate battle flag," and that Defendants have discriminated against Plaintiffs on the basis of religion in violation of the Equal Protection Clause of the Fourteenth Amendment.  (Doc. # 16, at "Second, Ninth, and Tenth Causes of Action").  Plaintiffs have voluntarily abandoned their religion claims and therefore the court will not address them here. (Doc. # 56, at 13-22).

claim.

In *Scott*, the Eleventh Circuit addressed facts similar to the case at hand and affirmed the constitutionality of the defendant school officials' suspension of two students for violating an unwritten ban on the display of Confederate flags on school grounds. *Scott,* 324 F. 3d at 1247. The court held:

> Although public school students' First Amendment rights are not forfeited at the school door, those rights should not interfere with a school administrator's professional observation that certain expressions have led to, and therefore could lead to, an unhealthy and potentially unsafe learning environment for the children they serve.

*Scott,* 324 F. 3d at 1247. The court reiterated that school officials can appropriately censure students' speech under either *Tinker v. Des Moines Independent Comm. School Dist*., 393 U.S. 503 (1969) or *Bethel School District v. Fraser*, 478 U.S. 675 (1986). *Scott,* 324 F. 3d at 1248. *Tinker* proclaims that school officials can restrict students' speech when they reasonably fear that certain speech is likely to "appreciably disrupt the appropriate discipline in the school." *Denno v. School Board of Volusia County Florida*, 218 F. 3d 1267, 1271 (11th Cir. 2000)*,* citing *Tinker*, 393 U.S. at 514. Alternatively, under *Fraser*, "even if disruption is not immediately likely, school officials are charged with the duty to 'inculcate the habits and manners of civility as values conducive both to happiness and to the practice of self-government.'" *Scott,* 324 F. 3d at 1248, citing *Denno*, 218 F.3d at 1271. *Fraser* mandates that officials have "the flexibility to control the tenor and contours of student speech within school walls or on school property." *Scott,* 324 F. 3d at 1248, citing *Denno*, 218 F.3d at 1271.[14] The court in *Scott* found that the school officials' Confederate flag ban satisfied

---

[14] As the Supreme Court stated in *Fraser*:

> Surely it is a highly appropriate function of public school education to prohibit the

both tests and therefore was not an unconstitutional restriction on speech.

Likewise, this court finds that Defendants' Confederate flag clothing ban was proper under both *Tinker* and *Fraser.*  Just as in *Scott*, Defendants in this case have presented evidence of racial tensions at the school and other disruptions that appeared to be race-based and related to the display of the Confederate flag. *See Scott*, 324 F. 3d at 1249.   Nichols testified that prior to implementation of the ban, more than one confrontation had occurred at LCHS involving students wearing Confederate flag shirts.   Nichols also had received reports from students (primarily minority students) who either felt uncomfortable in the academic setting when surrounded by students displaying the Confederate flag on their clothing, or reported having been harassed or intimidated by those students.   As noted earlier, although Plaintiffs dispute Nichols testimony, the court finds that their dispute is not supported by the evidence to which they cite.  *See* discussion footnote 9 *supra*.  Regardless, even assuming that Plaintiffs had sufficient evidence to dispute Nichols' testimony, they acknowledge (as they must) that at least one altercation ensued between a student

---

use of vulgar and offensive terms in public discourse. Indeed, the "fundamental values necessary to the maintenance of a democratic political system" disfavor the use of terms of debate highly offensive or highly threatening to others. Nothing in the Constitution prohibits the states from insisting that certain modes of expression are inappropriate and subject to sanctions. The inculcation of these values is truly the "work of the schools." *Tinker*, 393 U.S. at 508, 89 S. Ct. at 737... The determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board.

The process of educating our youth for citizenship in public schools is not confined to books, the curriculum, and the civics class; schools must teach by example the shared values of a civilized social order. Consciously or otherwise, teachers – and indeed the older students – demonstrate the appropriate form of civil discourse and political expression by their conduct and deportment in and out of class.

*Fraser*, 478 U.S. at 683.

wearing a Confederate flag shirt and a minority student, and Blake Grimes admitted that he and other students understood that the ban was implemented because an African-American student and parent had complained that Confederate flag clothing was offensive to them. (B. Grimes Depo. p. 73). Thus, this court finds that Defendants' ban was constitutional under the *Tinker* standard.

Moreover, even in the absence of such evidence of racial tensions, it was not unreasonable for Defendants to conclude that the Confederate battle flag has "uncivil aspects akin to those referred to in *Fraser*, in that many people are offended when the Confederate flag is worn on a tee-shirt or otherwise displayed." *Denno*, 218 F.3d at 1274.[15]   As the Eleventh Circuit has noted, "[w]ords like 'symbol,' 'heritage,' 'racism,' 'power,' 'slavery,' and 'white supremacy' are highly emotionally charged and reveal that for many, perhaps most, this is not merely an intellectual discourse. Real feelings--strong feelings--are involved. It is not only constitutionally allowable for school officials to closely contour the range of expression children are permitted regarding such volatile issues, it is their duty to do so." *Scott*, 324 F. 3d at 1249.[16]

---

[15] Plaintiffs pluck from *Denno* the Eleventh Circuit's recognition that "the Confederate flag is honored by many as a non-racist memorial to their Southern heritage," *Denno*, 218 F.3d at 1274, n.6, to bolster their argument that the display of the Confederate flag "clearly was an emotional matter of great public concern []and therefore [] should be permitted." (Doc. # 56, at 19).   Plaintiffs have grossly distorted the Eleventh Circuit's analysis in *Denno*.  What the court actually said is that it does not matter whether a plaintiff lacks racist intentions in displaying the Confederate flag or that other individuals revere the Confederate flag as a non-racist memorial to their Southern heritage; rather, the relevant issue is whether "the school official might reasonably think that other students would perceive the display as racist or otherwise uncivil."  *Denno*, 218 F.3d at 1274 n.6.  This is but one of many occasions when Plaintiffs have taken statements out of context in a thinly veiled attempt to conceal the fact that the Eleventh Circuit has clearly pronounced their First Amendment claim unviable.

[16] The Eleventh Circuit's conclusions above render meaningless Plaintiffs' suggestion that it takes a finding of the school board that the Confederate Flag was a symbol linked to racial prejudice in order to justify Defendants' actions in this case.  (Doc. # 56, at 21-22).

The August 1995 decision by another judge of this court to take judicial notice that "the wearing by a student in school of a shirt depicting a Confederate flag can cause dissension and disruption" carries new weight in light of the Eleventh Circuit's clear proclamation of this same observation in *Scott*. (*Hayward vs. Taylor*, CV-95-PT-1393-M, August 30, 1995 Memorandum Opinion of The Honorable Robert B. Propst (Doc. # 21)). As Judge Propst noted, "[o]nly an ostrich could conclude otherwise."[17] Therefore, under *Fraser*, "even if disruption is not immediately likely," Defendants' ban is nonetheless constitutional because it comports with the Defendants' duty under *Fraser* to "'inculcate the habits and manners of civility as values conducive both to happiness and to the practice of self-government.'" *Scott,* 324 F. 3d at 1248, citing *Denno*, 218 F.3d at 1271.[18]

Contrary to the clear authority of *Scott*, Plaintiffs call upon a body of general content-based First Amendment law, arguing that any restrictions imposed on Plaintiffs' free speech must be both reasonable and viewpoint neutral. (Doc. # 56, at 16-17) (citing *United States v. Kokinda*, 497 U.S. 720, 730 (1990) and *Griffin v. Department of Veterans Affairs*, 129 F. Supp. 2d 832, 843 (D. Md. 2001)). These cases are not applicable here in light of the niche carved by *Scott* and *Denno*. Plaintiffs also urge the court to ignore Eleventh Circuit law and instead apply cases from the Sixth

---

[17] Plaintiffs counter with the following assertion: "With due respect to the Honorable Judge Propst, if the evidence in this case shows anything, it shows that one cannot simply assume that the display of the Flag will be perceived as being offensive and racist, even in the Deep South." (Doc. # 56, at 19). To the contrary, that is exactly what the Eleventh Circuit necessarily concluded when it held that, "one only needs to consult the evening news to understand the concern school administrators had regarding the disruption, hurt feelings, emotional trauma and outright violence which the display of the [Confederate] symbols involved in this case could provoke." *Scott*, 324 F. 3d at 1249.

[18] Plaintiffs' attempt to distinguish *Fraser* by arguing that the expression in that case was during a school assembly while the displays at issue in this case are purely personal holds no water in light of *Scott*'s application of *Fraser* to substantially similar facts.

and Third Circuits which held Confederate flag bans to be unconstitutional.  (Doc. # 56, at 19-20)

(citing *Castorina v. Madison County Sch. Bd*., 246 F.3d 536 (6th Cir. 2000); *Sypniewski v. Warren*

*Hills Reg. Bd. of Educ*., 307 F.3d 243 (3rd Cir. 2002)).  This argument too, has no merit.  This court

cannot – and will not – rule for Plaintiffs when there is clear binding precedent to the contrary.

Plaintiffs also question Defendants' motives in this case.  They claim that the Confederate

Flag was singled out in this case, while other divisive symbols were ignored, suggesting that

Defendants had "no particular concern about the civility of the student's discourse."  (Doc. # 56, at

18).  Plaintiffs' argument is temporally deficient.  Blake Grimes testified that **after the ban was**

**implemented**, African-American students "would wear their Malcolm X or FUBU [shirts] and just

kind of make it known like they could wear theirs, but knowing we couldn't wear ours."  (B. Grimes

Depo. p. 131).  There is no evidence to suggest that, at the time the ban was implemented, Nichols

knew about and ignored incidents involving other symbols with racial undertones.  Moreover, Blake

Grimes admitted that he was not aware of any incident of disruption ever occurring at LCHS that

involved a student wearing a "FUBU" or Malcolm X shirt. (B. Grimes Depo. p. 134; Nichols Depo.

p. 95-96).

In fact, the undisputed evidence shows that Defendants took care in ensuring that the ban on

Confederate flag clothing was not overly broad. Defendants did not prohibit Cody Grimes'

distribution of pamphlets discussing the Confederate flag, (C. Grimes Depo. 17, 19, 44; Nichols

Depo. p. 114)) and did not ban certain displays of the flag that had not been linked to incidents of

disruption, such as class rings or other jewelry. (Rutherford Depo., p. 118; D. Grimes Depo., pp. 39,

69; Nichols Depo., p. 135).   Rutherford testified that he would permit students to wear shirts

displaying the State flag of Mississippi, even though it contains within it a Confederate Battle flag.

16

(Rutherford Depo. pp. 178-79).

In light of the clear weight of authority from the Eleventh Circuit on this issue, Plaintiffs have not shown that Defendants' ban was an unconstitutional deprivation of their First Amendment rights.

## VI.    Plaintiffs' National Origin Claims

Plaintiffs next allege that Defendants' ban of the Confederate flag violated their civil rights and their constitutionally guaranteed right of equal protection to be free from discrimination on the basis of national origin, which the plaintiffs describe as "Confederate Southern American." (Doc. # 16, at "Third and Fourth Causes of Action").[19]   They invite this court to be the first to recognize "Confederate Southern American" as a protected national origin. The court declines to do so for the reasons outlined below.

As a threshold matter, the court must define what it means to be "Confederate Southern American."  That task is not an easy one – Plaintiffs' explanation of the alleged national origin is a moving target.  On the one hand, Plaintiffs' *attorneys* offer the following definition in their summary judgment opposition brief:

> A Confederate Southern American is an individual who descends from those who lived in and often (but not necessarily) fought for the Confederate States of America.

_____

[19] Plaintiffs' Second Amended Complaint also asserts discrimination claims based on "Cherokee" as their national origin.  (*Compare* and  Doc. # 16, at "Fifth and Sixth Causes of Action" *with* Doc. # 56).   Plaintiffs have voluntarily abandoned these claims, however, (Doc. # 56, at 22-30), and for good reason. Plaintiffs have not produced substantial evidence to demonstrate they are Native American (*see* D. Grimes Depo., pp. 71-73), and regardless, the undisputed facts do not establish any discrimination against Plaintiffs on the basis of Cherokee heritage.  Blake Grimes admitted that his "Dixie Outfitter" tee-shirts that display the Confederate flag did not say anything about Cherokee heritage. (B. Grimes Depo., pp. 122-23). Plaintiffs also testified that the only message they intended to convey by wearing Confederate flag shirts was pride in Southern heritage and that no one who saw their shirts displaying the Confederate flag would have interpreted them to convey any message about Native American heritage.  (B. Grimes Depo., pp., 129, 122-23; C. Grimes Depo., pp. 68-69, 81).

By definition, this requires a person claiming Confederate Southern American heritage to be a descendent from individuals residing in one of the thirteen states that seceded from the federal Union in 1861 and fought against the federal army between 1861 and 1865.  In other words, to be a Confederate Southern American, it is necessary but not sufficient that one be a Southerner; put yet another way, all Confederate Southern Americans are Southerners, but not all Southerners are Confederate-Southern Americans.

(Doc. # 56, at 29).   On the other hand, *each Plaintiff* offers a different interpretation in his deposition.  Although Blake Grimes suggests that a "Confederate Southern American" has ancestors who fought for the Confederate States of America (B. Grimes Depo., p. 126), he also believes that a blood relationship to a Confederate soldier is not required.   Those who merely identify with Confederate soldiers can also say they are "Confederate Southern American."  (B. Grimes Depo., pp. 126-27).  Doyle Grimes testified that he does not consider "Confederate Southern American" heritage to be dependent upon any ancestral relationship to persons who served in the Confederate military; rather it requires being "involved in the Confederate ancestry," *i.e.* attending Confederate war re-enactments and "anything that is held," and growing up and living in the South.  (D. Grimes Depo., pp. 73-74).  Cody Grimes defined his claim to "Southern heritage" by stating merely "that I was born and raised in the South, and my ancestors were born and raised in the South, and we're just southern."  (C. Grimes Depo., p. 49).

Despite the plethora of definitions offered by Plaintiffs, the court will give Plaintiffs the benefit of the doubt and assume, as Plaintiffs' attorneys suggest, that a Confederate Southern American is an individual who descends from those who lived in and often (but not necessarily) fought for the Confederate States of America.  Even under this definition, however, the court finds that summary judgment is appropriate because Plaintiffs have not produced substantial evidence to indicate that they are, indeed, Confederate Southern American.

18

When questioned about how their claimed ancestry differs from anyone else who was born and raised in the South, Blake Grimes testified that he believes on his "grandmother's aunt's side" there were six brothers whose last name was Cash who fought in the Civil War on the side of the Confederate States of America. (B. Grimes Depo., pp. 118-120). Blake candidly admits that he did not come to believe this was his ancestry until after the ban on Confederate flags had been implemented at Lawrence County High School. (B. Grimes Depo., p. 120). Although Doyle Grimes believes that his family has Confederate ancestors, he cannot "trace it back very well" and is not aware of any records that detail the ancestry of his side of the family. (D. Grimes Depo. pp. 74-75). Given the paltry evidence of ancestry provided by the Plaintiffs in this case, the court finds that they have not even met their own attorneys' definition of their claimed national origin.[20] Summary judgment is due to be granted for this reason alone.

Moreover, summary judgment is appropriate because, even assuming Plaintiffs have presented substantial evidence demonstrating that they are Confederate Southern American, this court finds that it is not a protected national origin group. Plaintiffs urge this court to recognize a

---

[20]As the Plaintiffs' brief recognizes, the Supreme Court's interpretation of "national origin" under the Civil Right Act of 1964 suggests that, at a minimum, Plaintiffs must show ancestry to the group claimed. In *Espinoza v. Farah Manuf. Co., Inc.*, 414 U.S. 86 (1973), the Court noted:

> The only direct definition given to the phrase 'national origin' is the following remark made on the floor of the House of Representatives by Congressman Roosevelt, Chairman of the House Subcommittee which reported the bill: 'It means the country from which you or your forebears came ... You may come from Poland, Czechoslovakia, England, France or any other country.' We also note that an earlier version of § 703 had referred to discrimination because of 'race, color, religion, national origin, or *ancestry*,' suggesting that the terms 'national origin' and 'ancestry' were considered synonymous.

*Espinoza*, 414 U.S. at 88-89 (emphasis in the original; internal citations omitted).

new national origin because they contend that Confederate Southern Americans, while admittedly not a "separate nation," are nonetheless a distinct, sub-national group with a separate identity despite their existence within the boundaries of another, larger, sovereign nation-state. (Doc. # 56, at 25-30). Plaintiffs point out that "proof of national origin does not require a claimant to produce a map and point to a particular country from whence his ancestors came," and they maintain that there are identifiable cultural and linguistic signs and characteristics associated with Confederate Southern Americans. (Doc. # 56, at 25). Plaintiffs also point to several district court cases in which national origin protection has been extended to other "sub-national" groups. *See Roach v. Dresser Ind. Valve & Instrument Div.*, 494 F.Supp. 215 (W.D. La. 1980) (extending protection to the Acadians of Louisiana); *Metoyer v. State of Kansas*, 874 F. Supp. 1198 (D. Kan. 1995) (finding that Creole is a valid national origin); *Janko v. Illinois State Toll Highway Auth.*, 704 F. Supp. 1531 (N.D. Ill. 1989) (holding that Gypsies are due national origin protection).

A review of relevant case law, however, reveals that other courts have declined to find that "Confederate Southern American" is a valid national origin. Within this Circuit, the Middle District of Florida recently considered, and rejected, some of the same "Confederate Southern American" arguments presented by Plaintiffs in this case. *Fanucci v. Minetta*, No. 03-00223-CV-J-20-HTS. (M.D.Fla. 2003). In *Fanucci*, the plaintiffs, represented by the same attorneys in this case, claimed that an Federal Aviation Administration manager's decision to ban display of the Confederate flag at work constituted discrimination on the basis of national origin, race, and religion under Title VII. *Fanucci*, Doc. # 40, March 18, 2004 Order, at 1-2. The court granted summary judgment for the defendants, in part because plaintiffs had not established that they are members of a protected national origin group. *Fanucci*, Doc. # 40, March 18, 2004 Order, at 5-10. The court held that: (1)

based on prior rulings of the Supreme Court, the Confederacy was not a sovereign nation; (2) cases

in which other courts have recognized distinct sub-national groups as protected national origins are

distinguishable because those plaintiffs were members of a recognized ethnic group and could trace

their ancestry to a foreign colony, former independent nation, or foreign geographic region; and (3)

regionalism is insufficient to establish a separate national origin group. *Fanucci*, Doc. # 40, March

18, 2004 Order, at 5-10.  In an unpublished opinion, the Eleventh Circuit affirmed the findings of

the court. *Fanucci v. Minetta*, No. 04-12478 (11th Cir. 2005).[21]  Moreover, at least one other Court

of Appeals – the Fourth Circuit – has rejected the contention that "Confederate-American" is a valid

basis for a national origin discrimination claim. *Terrill v. Chao,* 31 Fed. Appx. 99 (4th Cir. 2002).

   Against this backdrop of case law, the court declines to find that "Confederate Southern

American" is a viable national origin.  For the same reasons articulated by the court in *Fanucci,* this

court cannot conclude that Confederate Southern Americans are a distinct sub-national group entitled

to protection as a separate national origin.  Unlike the sub-national groups recognized as national

origins in the district court cases cited by Plaintiffs, Confederate Southern Americans are not able

to trace their ancestry to a foreign area; rather, their ancestry is traced only to a region of the United

States which was in rebellion for a period of time. *Fanucci*, Doc. # 40, March 18, 2004 Order, at

9.  Accordingly, Plaintiffs fail to establish that they are due national origin protection and their

national origin discrimination claims, both constitutional[22] and statutory, are due to be dismissed.

---

   [21] Although not binding on this court, the Eleventh Circuit's rejection of Confederate Southern
American as a separate national origin is nonetheless persuasive. *See* Eleventh Circuit Rule 36-2
("Unpublished opinions are not considered binding precedent. They may be cited as persuasive
authority . . . .").

   [22]The same considerations which lead the court to find Plaintiffs have no statutory national origin
claim – their failure to show they are in fact Confederate Southern Americans and (even more

**VII.   Plaintiffs' Race Claims**

Plaintiffs' complaint also alleges that they have been discriminated against on the basis of their race in violation of "constitutionally guaranteed rights of equal protection" and "civil rights," which they define only as "the Civil Rights Act of 1964."  (Doc. # 16, at "Seventh and Eighth Causes of Action").  Although Plaintiffs "specifically reject the notion that there is a racial component to one's identity as Confederate-Southern American," they allege that Defendants' actions in "suspending only those students who displayed Confederate symbols, and their failure to deal similarly with the display of other symbols associated with other races . . . ha[ve] created a hostile learning environment for White, Cherokee, and mixed race students proud of their Confederate ancestry and heritage."  (Doc. # 16, at "Seventh and Eighth Causes of Action").  Plaintiffs' opposition brief clarifies that their statutory and constitutional race claims are based on a disparate impact theory:

> Defendants' prohibition against displaying the Flag had a **disparate impact** on white/Cherokee students because most students wishing to display the Flag (whether or not they consider themselves Confederate Southern Americans) are white, or white with Cherokee ancestry so that the Flag Ban stereotypes white/Cherokee students as racists, and ultimately discriminates against them on the basis of race.

(Doc. # 56, at 30-32) (emphasis added).

As an initial matter, the court notes that Defendants argue – and Plaintiffs have not contested – that Plaintiffs' Seventh and Eighth Causes of Actions are stated only on behalf of the students who were suspended. (Doc. # 16, at "Seventh and Eighth Causes of Action").   It is undisputed that Cody Grimes was not suspended (C. Grimes Depo. p. 36), and therefore the only remaining race claims

importantly) the court's finding that Confederate Southern Americans are not a protected national group in any event – also foreclose their constitutional claims.

are the ones asserted by Blake Grimes. As noted earlier, Blake Grimes lacks standing to pursue his claims and therefore, summary judgment is due to be granted as to these claims for that reason alone.

### A.   Statutory Claim under "The Civil Rights Act of 1964"

However, even if Blake Grimes had standing to pursue his race claims, summary judgment is nonetheless appropriate. First, Blake's statutory race claim necessarily fails. Although he generally claims that Defendants' actions violated "the Civil Rights Act of 1964," the only section of that Act which potentially applies to his educational-setting race claim is Title VI, which prohibits discrimination in programs receiving federal financial assistance. The Supreme Court has made clear, however, that disparate impact claims are not actionable under Title VI. *Alexander v. Sandoval*, 532 U.S. 275, 285-293 (2001). Accordingly, because Blake Grimes has not stated an actionable race-based disparate impact claim under any statutory authority, summary judgment is due to be granted in favor of Defendants on this claim.

### B.   Constitutional Claim under the Fourteenth Amendment

Summary judgment is also appropriate on Blake Grimes' constitutional disparate impact claim under the Fourteenth Amendment's Equal Protection Clause. It is undisputed in this case that Defendants' ban on Confederate clothing applied equally to all students. Instead, Plaintiff claims that the ban unequally impacted white, Cherokee, and mixed-race students. Plaintiff's constitutional claim fails for two reasons – one factual, the other legal. First, factually, Plaintiff has presented no evidence that the ban did, in fact, result in a disparate impact. Although Plaintiff's attorneys allege that "most students wishing to display the Flag (whether or not they consider themselves Confederate Southern Americans) are white, or white with Cherokee ancestry so that the Flag Ban stereotypes white/Cherokee students as racists," (Doc. # 56, at 31), Plaintiff's testimony clearly indicates

23

otherwise.

     Q: Well, did only white students wear Confederate flag symbols to school?

     A: No. There was [sic] black students that I've seen on several occasions that wore Confederate flag necklaces and jewelry and shirts.

(B. Grimes Depo. p. 148).  Plaintiff cannot demonstrate that a ban which applied to all students disparately impacted some students or "stereotyped" them as racists when Plaintiff *admits* that other students outside of those races also wore, and on October 12, 2001 were prevented from wearing, the Confederate flag to school.

     Moreover, as a matter of law, summary judgment is due to be granted on Blake Grimes' constitutional claim because he has not presented substantial evidence that Defendants had a racially discriminatory purpose in implementing and enforcing the ban.  It is well settled that disparate impact without proof of discriminatory intent is not actionable under the Equal Protection Clause. *See Washington v. Davis*, 426 U.S. 229, 239-40 (1976).  As the Eleventh Circuit has noted, "The unlawful administration by state officers of a [rule] fair on its face, resulting in unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination." *ENT Realty v. Strickland*, 830 F. 2d 1107, 1112-13 (11th Cir. 1987).  As noted earlier, the ban on Confederate flag shirts at Lawrence County High School was implemented in response to increasing disruption, complaints, and incidents involving students wearing Confederate flag shirts.  *See* discussion Section V *supra*. Blake Grimes admits that he was suspended because he intentionally wore a Confederate flag shirt to defy the school's policy against it.  The undisputed facts do not establish any discriminatory purpose for Defendants' actions, and they are entitled to summary judgment as to Plaintiff's

constitutional race claim for this reason as well.

## VIII.   Procedural Due Process Claims

Finally, Plaintiffs have alleged that they were not provided adequate due process before being suspended from Lawrence County High School.  (Doc. # 16, at "Eleventh Cause of Action").  It is undisputed that Cody Grimes was not suspended (C. Grimes Depo. p. 36), and Plaintiffs have not disputed that this count is not asserted on his behalf (through his father, Doyle Grimes).  (Doc. # 56, at 32-34).  Thus, the only remaining procedural due process claim is the one asserted by Blake Grimes.  As noted earlier, Blake lacks standing to pursue his claims and therefore, summary judgment is due to be granted as to this claim for that reason alone.

Even if Blake had standing to pursue this claim, it fails on the merits because the due process afforded to Blake before his suspension far exceeds that which is required in the public school setting.  In *Goss v. Lopez*, 419 U.S. 565 (1975), the Supreme Court articulated the procedural protections that must be afforded to students in connection with short-term suspensions from public school:

> Students facing temporary suspension have interests qualifying for protection of the Due Process Clause, and due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story.

> There need be no delay between the time "notice" is given and the time of the hearing.  In the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred.  We hold only that, in being given an opportunity to explain his version of the facts at this discussion, the student first be told what he is accused of doing and what the basis of the accusation is.

*Goss*, 419 U.S. at 581-82.

The undisputed facts indicate that Blake met with Nichols and was informed of the offense of which he had been accused – deliberately planning with other students to violate the ban as a means of protest – before he was suspended.  (B. Grimes Depo. p. 48-49, 50-51, 81, 92-93, 140). Nichols confirmed that Blake was aware of the ban and that he had intentionally violated it, and Nichols provided Grimes with an opportunity to explain his reasons for having done so. (B. Grimes Depo. p. 81, 92-93). The court finds that at that point, the minimum due process requirements established in *Goss v. Lopez* were completely met.  Nevertheless, Defendants also allowed Blake to meet with the school superintendent the same day the suspension was imposed and to appear before a hearing panel during the duration of the suspension. (B. Grimes Depo. p. 94-95, 100-01; D. Grimes pp. 24-25). Neither of those opportunities were required under *Goss*.  Without question, Blake Grimes received more than the minimal due process required by law.[23]

Blake maintains that due process was not afforded to him because "the so-called opportunities [he was] given to explain [himself] were only to Defendants — the same people who imposed and implemented the unconstitutional ban in the first place." (Doc. # 56, at 33).  Plaintiffs rely on *Gibson v. Berryhill*, 411 U.S. 564, 569 (1973) and *Little v. Streatter*, 452 U.S. 1, 5-6 (1981) for the premise that due process requires both notice and a *meaningful* opportunity to be heard by an *impartial* tribunal before the deprivation of life, liberty, or property occurs.

Plaintiffs' argument defies clear Supreme Court and Eleventh Circuit law to the contrary. *Gibson* and *Little*, the cases cited by Plaintiffs as requiring a hearing before a separate tribunal are not controlling in a public education setting.  *See Gibson*, 411 U.S. at 569 (addressing proceedings

---

[23] Moreover, Rutherford ultimately expunged Grimes' record of any notation concerning the suspension and allowed him to make up all the schoolwork that he missed during the period of the suspension.  (B. Grimes Depo. p. 95-97).

to revoke the licenses of optometrists) and *Little v. Streater*, 452 U.S. at 5-6 (considering the denial

of a paternity test requested by a putative father who was incarcerated).  A "meaningful" hearing

before a separate impartial tribunal is simply not required here.  As the Eleventh Circuit has noted,

> The dictates of *Goss* are clear and extremely limited: Briefly stated, once school administrators tell a student what they heard or saw, ask why they heard or saw it, and allow a brief response, a student has received all the process that the Fourteenth Amendment demands. The only other requirement arises from the Court's admonishment that the hearing come before removal from school "as a general rule," unless a student's continued presence is dangerous or disruptive. In these instances, removal can be immediate.

*C.B. by & Through Breeding v. Driscoll*, 82 F.3d 383, 386 (11th Cir., 1996).[24]  In *Driscoll*, the court

held that due process was given when the school principal *who made the decision to suspend the*

*student* participated in a telephone conference with the plaintiff student's mother, even though the

decision to suspend the student had been made before the telephone call took place.  *Driscoll*, 82

F.3d at 386-87.

The undisputed evidence shows that Defendants' actions in this case satisfy the very low

threshold for procedural due process in a public school setting.  Thus, even if Blake Grimes had

standing to pursue this claim, summary judgment is nonetheless appropriate.

## IX.   Conclusion

For the reasons stated above, Defendants' motion for summary judgment is due to be granted.

The court finds that no genuine issues of material fact remain for trial and that Defendants are

---

[24] In fact, when students are removed from school for creating a disturbance, "a tentative decision to continue to suspend the students for some days may be made before a hearing as long as the disciplinarian goes on to hold a prompt – given the practicalities – hearing at which the preliminary decision to suspend can be reversed." *Driscoll*, 82 F.3d at 386-87 (citing *Sweet v. Childs*, 518 F.2d 320, 321 (5th Cir. 1975)).  The undisputed facts in this case suggest that Blake Grimes' clear defiance of school rules was disruptive enough to warrant suspension without a pre-disciplinary hearing.

entitled to judgment as a matter of law.  Defendants' motion to strike will be denied.  A separate order will be entered.

      **DONE** and **ORDERED** this _____12th_____ day of August, 2005.

                                      **R. DAVID PROCTOR**
                                      UNITED STATES DISTRICT JUDGE